[Crim. No. 2652.  First Dist., Div. One.  Aug. 1, 1950.]

THE PEOPLE, Respondent, v. GEORGE E. SMITH, Appellant.

Van H. Pinney for Appellant.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, N. J. Menard, District Attorney and Allan P. Lindsay, Deputy District Attorney, for Respondent.

WOOD (FRED B.), J.—Defendant was convicted of burglary in the second degree—entry of a building, the office of the Santa Clara County Building Inspector, Hall of Records, San Jose, with intent to commit theft therein. A charge of a prior conviction of a felony was found to be true. The appeal is from the judgment and from the order denying his motion for a new trial.

Two points are made upon this appeal: (1) Insufficiency of the evidence to support the verdict and (2) error in the giving of instructions to the jury.

### As to the Sufficiency of the Evidence

A typewriter belonging to the county and used in the county building inspector's office was removed, without permission, some time between 5:30 p. m. of May 18, 1949, and 8 a. m. of the next day.

At about 7:30 p. m. of May 18, defendant took this typewriter to a tavern at 13 South Market Street, San Jose, offered it for sale, and sold it to the tavern proprietor for $28, stating that he was selling it for a finance company that had repossessed it, selling it for the balance due. He executed a receipt therefor in the name of "Russell Eggert," but did at the time exhibit identification cards which showed his true name, and on the witness stand he said he signed Eggert's name because it was Eggert's typewriter.

At about 5:20 p.m. of May 18, defendant went to this tavern, spoke to an employee there, offered a typewriter for sale, was told to telephone the proprietor at his house about the typewriter, apparently did telephone him, and then returned with the typewriter about 7:30 of that evening.

The proprietor, suspecting that the typewriter may have been stolen, called the police department and asked if it was all right if he bought it, and was told it would be, so long as he got a receipt for it.

In response to a call, two city police officers arrived at the tavern about 8 p. m. The receipt for the sale of the typewriter had already been executed. They asked defendant where the typewriter came from and he stated he got it from Russell Eggert, that Russell was parked opposite a firehouse about 100 yards from the tavern, in a '37 Dodge coupe, with Washington license plates; that Russell was parked there waiting for defendant; that it was Russell's typewriter—it had come from Dohrman's in Seattle; that defendant could prove it if he could get hold of Russell; that it was in the car when Russell was driving; that they left San Francisco that afternoon around 4 o'clock; that they were in need of money; that Russell asked defendant if he would go and sell it, and was waiting for defendant on the street; that the typewriter was in the car when they left San Francisco—in Russell's car, in the back.

The officers took defendant around in their car in an attempt to locate Eggert. Defendant stated that if Russell was not there he could locate him at the De Anza Hotel. After they made a tour of the district in the vicinity of the tavern looking for Eggert and were unable to find him, they went to the De Anza Hotel and checked, but no one by that name had signed up for a room. They again checked, but nobody had signed in at the hotel under the name of Eggert. The officers testified that they checked at the hotel as late as 2 a. m. of the following morning and could not find Russell Eggert or the Dodge coupe.

After they were unable to locate Eggert, defendant told the officers he did not come down with Eggert that afternoon, but came down on a bus. When asked when he last saw Eggert, he told the officers "yesterday," which would be May 17, and that he had not seen him since. Defendant testified that he did not tell anyone that the typewriter was in the automobile that he came down in, and that so far as he knew he did not tell the officers he came down in the car. He testified that he left San Francisco on a bus at 3 p. m., or a little after, and must have arrived at San Jose after 5 p. m.

The officers found but $26.02 upon the person of the defendant, aside from some loose change which was upon the bar and which, at their suggestion, he put in his pocket; defendant had told them he was broke and this was why he was selling the typewriter. Defendant testified that on that day, about four hours before he was put in jail, he drew $47 from his employer

in Daly City, paid about $15 of it for his board at Daly City, in advance, retaining the balance thereof; that he thought the policeman gave it back to him at the bar; that he received $28 from the tavern proprietor; that he did not know how much the proprietor gave him; that he did not give him any; that when the police took defendant the proprietor took the money; that defendant had the money in his hands; that beside that defendant did not have $30 or $35; that he had just what he turned over to the police, $26.02; that he laid it on the bar; that he had all of his paycheck except what he paid for board.

Concerning his possession and sale of the typewriter, defendant testified upon direct examination that Eggert was in the business of buying and selling service stations, including the equipment; that Eggert had this and another typewriter and an adding machine, told defendant he purchased them legitimately, and otherwise than this defendant did not know. Asked, upon cross-examination, if he told them at the tavern that he was repossessing the typewriter for a finance company, defendant said ''That was all the information I had.''

When defendant was apprehended by the officers at the tavern, there were two pencils found on his person, of the same kind as those used by the county building inspector's office, though not identified as having come from that office. At the trial, defendant stated he stole those pencils from San Quentin; that he did not steal them, that he took them with him, that they had a whole batch and he filled his pockets up.

The officers testified that defendant told them the evening he was arrested that he had been earlier that evening to the county jail in an attempt to locate Charles Hambaugh, to ask him a favor. Hambaugh, the county jailor, testified that a few days before the trial defendant said he was down that way at possibly 5:30 in the evening, that he came with the possibility to stay all night, to sleep in the jail, and that defendant spoke to Deputy Sheriff King, who was the jailor at midnight. Defendant, on direct examination, referring to Officer Cannell's statement with reference to Hambaugh, said that Cannell got it turned around; that defendant came down to see the district attorney's office; that he did not come down to see Mr. Hambaugh, and that he came to ask if they would recommend that defendant go back to Carolina. But upon cross-examination defendant stated that shortly after he first went to the tavern to offer a typewriter for sale he went to the county jail, talked with Mr. King, deputy sheriff, asked if Hambaugh was working; that defendant wanted a place to

spend the night, and told King he had the money but could not afford to spend it. The jail was situated about 25 feet from the county building inspector's office.

There is testimony that defendant had knowledge of means of access to the room where the typewriter was kept and used. The county building inspector's office was in a group of four rooms in the basement of the Hall of Records; an anteroom, the deputy building inspector's office, the building inspector's office, and a central equipment room. The anteroom had a door to the street which contained a small sliding panel which could be opened from the street side, an arm put through and the door unlocked. The deputy's office was next to the anteroom. The door from the anteroom to the deputy's office was never locked. The inspector's office was next to the deputy's office. The door between them was locked, but the key to it was kept in the top drawer of a desk near the door in the deputy's office. Another door from the anteroom opened into the central equipment room.

From about January 1 to March 11, 1948, defendant, a trusty in the county jail, worked for the county superintendent of buildings in the central equipment room. They worked the whole room, putting in counters and refinishing desks. One week end the superintendent asked the defendant if he wanted to come in and work, and asked defendant if he needed a key, and defendant said no, he could get in. When asked how, he said, "I have a way to get in there." The superintendent did not know how defendant actually got in there; nevertheless, on week ends defendant did work in the place and the superintendent was not there.

The evidence amply supports the verdict. That a burglary was committed by someone appears without conflict. Defendant's possession and sale of the stolen property soon after its taking, while not sufficient of itself for a conclusion by the jury that he entered the building with intent to commit theft, is a circumstance which, taken with the corroborating evidence of defendant's offer to sell a typewriter shortly before the taking, his presence near the building thereafter and early in the two-hour period during which the building was entered, and his knowledge of the means of access to the office from which the property was taken; his conflicting statements concerning his movements on the day of the entry, the manner in which he acquired possession, for whom and for what purpose he sold the property, and what funds if any he had in addition to

the money paid him for the property; and the nonavailability of the person from whom he said he obtained the property though search was made for that person, constituted evidence before the jury sufficient to connect defendant with the crime, amply sufficient in law to support the verdict of guilty. (*People* v. *Machabie,* 33 Cal.2d 67, 69 [198 P.2d 681]; *People* v. *Russell,* 34 Cal.App.2d 665, 669 [94 P.2d 400]; *People* v. *McCann,* 34 Cal.App.2d 376, 377 [93 P.2d 643]; *People* v. *Golembiewski,* 25 Cal.App.2d 115, 117 [76 P.2d 717]; *People* v. *Morris,* 124 Cal.App. 402, 404 [12 P.2d 679]; *People* v. *Russell,* 120 Cal.App. 622, 625 [8 P.2d 209]; and cases therein cited.)

### *As to Asserted Errors in Instructing the Jury*

█ Defendant claims that by instruction No. 9 the trial court erroneously told the jury that proof of possession of the stolen property by defendant was sufficient evidence that he entered the building with intent to commit theft, and assumed the guilt of defendant; and that error occurred in the asserted failure of the court upon its own motion to give instructions (1) to the effect that unexplained possession of stolen property soon after the taking, is not sufficient to justify conviction, and (2) that the evidence of defendant's prior conviction should be considered only as affecting defendant's credibility and not for other purposes.

Instruction No. 9 was as follows:

"The charge made against the defendant is that of burglary. Burglary is defined in Section 459 of the Penal Code of this state as follows, at least insofar as it refers to this particular case:

" 'Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse, or other building, tent, vessel, railroad car, mine, or any underground portion thereof, with intent to commit grand or petit larceny, or any felony is guilty of burglary.'

"In other words, insofar as this particular case is concerned, the element necessary to be proved is the defendant entered a building with intent to commit larceny. Larceny is stealing. This defendant in this case is not charged with stealing anything. Larceny is an entirely different offense. Burglary does not involve stealing at all. The principal charge of burglary is the unlawful entering of a building with that intent. If a person intending to steal breaks into a house, or building, whatever structure it may be, with intent, the minute he

enters he is guilty of burglary, even if he does not take anything at all. Intent is a thing that exists in the mind, of course is not susceptible of direct proof. There is no way of putting a witness on the stand, saying this man intended this or that, because that is in his mind, we can't open his skull and read it like a book, intent has to be proved, but may be proved by circumstances. You see every crime consists of an act and intent.

'' 'The intent or intention,' says Section 21 of the Penal Code, 'is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused.' You determine what a man intends to do by what he does. If, for instance, a man breaks into your house and takes your money, there is no way of proving what was in his mind as to intent, but if proven he broke in the house and is caught with money, he hasn't any right to it, you have a right to draw the inference when he went in he intended to steal, because after he went in he did steal. As I say, we are not charging this man with stealing this typewriter, but with entering the office of the Santa Clara County Building Inspector, located in the Hall of Records in the Court house of Santa Clara County with the intent to commit theft. And the basis, the method by which the People undertake to prove it is by showing from their testimony that this typewriter was in that building at a certain time, and that thereafter was in the defendant's possession, was sold by him, at least disposed of, and under the various circumstances shown in the evidence of this case. It is up to the jury to determine whether or not the defendant entered this building with the intent of stealing, committing larceny. I think that is about as clear a definition as I can give you.''

We do not derive from this instruction an assumption of guilt upon the part of the defendant. It correctly defines the crime of burglary, discusses the elements of entry and of intent to commit theft, and concludes with the reminder that ''It is up to the jury to determine whether or not the defendant entered this building with the intent of stealing, committing larceny.'' The court had by other instructions properly advised the jury on such matters as the function of the jury as exclusive judges of the facts, the presumption of innocence, and the burden and degree of proof required.

We consider this instruction uncertain and inadequate concerning possession of stolen property by a defendant. It tells the jury that the ''method by which the People under-

take to prove'' entry by defendant with intent to commit theft is by testimony that this ''typewriter was in that building at a certain time,'' and ''thereafter was in the defendant's possession, was sold by him, at least disposed of, and under the various circumstances shown in the evidence of this case.'' This was a statement, in effect, that evidence of possession and ''the various circumstances shown in the evidence of this case,'' were for the consideration of the jury in determining whether or not defendant entered the building and did so with the intent of stealing. This was not an instruction that mere possession of the stolen property by the defendant was sufficient to prove that he committed the burglary, but it did fail to advise the jury as to the evidentiary significance of such possession. There should have been an instruction framed upon the principle, expressed in *People* v. *Russell, supra,* 120 Cal.App. 622, at page 625, that possession of stolen property ''is a circumstance which may be considered by the jury in connection with other evidence,'' that there must be in addition to such possession ''shortly after the commission of the crime, corroborating circumstances, acts, conduct or declarations of the defendant tending to show his guilt,'' and that ''failure of the accused to account for such possession upon a theory inconsistent with his guilt of the offense charged, or to show that the possession was honestly obtained, is itself a circumstance tending to show guilt.'' (See, also, *People* v. *Johnson,* 85 Cal. App.2d 240, 244-245 [192 P.2d 483] ; *People* v. *Arbaugh,* 82 Cal.App.2d 971, 987-988 [187 P.2d 866] ; *People* v. *Azbill,* 134 Cal.App. 616, 619 [25 P.2d 1010].)

But it does not necessarily follow that error in this regard requires a reversal of the trial court. The Constitution declares that ''No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'' (Const., art. VI, § 4½.) Where the evidence of guilt is clear and convincing and it appears that a different verdict would not otherwise have been probable, ordinarily a judgment of conviction will not be reversed solely for error in or the failure to give an instruction. (*People* v. *Kelso,* 25 Cal.2d 848, 853 [155 P.2d 819].) Similarly, an incomplete instruction is not deemed ground for reversal if upon examination of the entire record it appears to the court improbable that the jury would have given a different verdict but for the error. (*People* v.

*Bender,* 27 Cal.2d 164, 177 [163 P.2d 8]; *People* v. *Koenig,* 29 Cal.2d 87, 93 [173 P.2d 1].) We have examined the entire record, including the evidence, in the instant case and are convinced that no prejudicial error occurred, and that the same verdict would have been returned had the instruction been complete, clear, and correct in every respect.

■ The failure of the trial court upon its own motion to instruct the jury that evidence of defendant's prior conviction should be considered only as affecting defendant's credibility and not for other purposes, did not constitute error, certainly not prejudicial error.

It is the duty of the trial court in a criminal case to instruct the jury of its own motion, charging it fully and fairly upon the law relating to the facts of the case. (*People* v. *Warren,* 16 Cal.2d 103, 116 [104 P.2d 1024]; *People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367].)

It does not appear that the facts of the instant case required the giving of any such cautionary instruction. The only testimony in any way bearing upon a prior conviction was that voluntarily given by the defendant. Upon direct examination he said, ''they will bring it up, the prosecution will, pertaining to, we will say, a record from San Quentin. I doubt if I am the first one that ever went, or the last one. I was there for using a car without the owner's consent.'' Prior to taking the witness stand, he volunteered an explanation of his possession of certain pencils, stating, ''I stole them from San Quentin, I know where they come from, I didn't steal them, took them with me, they had a whole batch, I filled my pockets up . . .'' He was not cross-examined as to either of these statements, nor do we find elsewhere in the entire record any comment concerning or any reference to a prior conviction except that (1) the information charged a prior, and (2) upon arraignment defendant admitted the prior conviction. The record discloses that after the jury was impaneled the information was read to the jury and the jury was informed that the defendant entered a plea of not guilty. It is presumed, in the absence of anything in the record to the contrary, that in reading the information to the jury the clerk observed the requirements of sections 1025 and 1093 of the Penal Code and omitted all thereof that related to the previous conviction. There is a presumption of regularity of the proceedings. (*People* v. *Hickok,* 96 Cal.App.2d 621, 625 [216 P.2d 140]; *People* v. *Gonzales,* 88 Cal.App. 245, 247 [262 P. 1115].)

This is quite unlike *People* v. *Blanks,* 67 Cal.App.2d 132 [153 P.2d 449], upon which defendant relies. In that case the defendant, while on the witness stand, was asked as to certain prior convictions and admitted that he had been convicted of burglary and of receiving stolen property in other states. He requested, and was refused, an instruction that the admission of testimony with reference to prior convictions was for the sole purpose of impeachment and that such evidence was to be considered only in relation to the credibility of the defendant as a witness and as to the weight which should be given to his testimony. This request was made after a juror stated he did not understand a certain instruction "about the testimony being impeached, if they had been convicted of a felony previously." (Pp. 136-137.) The appellate court deemed the giving of the requested instruction "an important matter in view of the appellant's admissions as to prior convictions and the meager nature of the evidence connecting him with the crime." (P. 137.) The instant case is more like *People* v. *Owens,* 79 Cal.App.2d 290, 299 [179 P.2d 401], in which no request was made for such an instruction and the evidence of prior conviction was offered by defendant as a part of his case in chief, in view of which it was held that the defendant should not be heard to complain. It cannot be the law that when a prior conviction is charged in the information, admitted upon arraignment, and never mentioned in the presence of the jury by the prosecution or the court, a defendant by voluntarily testifying or commenting concerning it can cast a duty upon the court of its own motion to give an instruction concerning it.

The judgment and order appealed from are affirmed.

Peters, P. J., and Bray, J., concurred.